**In re David M. PTASINSKI and Maureen T. Ptasinski, Debtors.**

**Brian Sanderson and Marie A. Sanderson, Plaintiffs,**

v.

**David M. Ptasinski and Maureen T. Ptasinski, Defendants.**

**Bankruptcy No. 02–20524. Adversary No. 02–2172.**

United States Bankruptcy Court, W.D. New York.

Feb. 13, 2003.

Leonard Relin, Rochester, NY, for debtors.

**DECISION & ORDER**

JOHN C. NINFO, II, Chief Judge.

### BACKGROUND

On February 20, 2002, David M. Ptasinski ("David Ptasinski") and Maureen T. Ptasinski ("Maureen Ptasinski") (collectively, the "Debtors") filed a petition initiating a Chapter 7 case. On March 7, 2002, the Debtors filed the Schedules and Statements required to be filed by Section 521 and Rule 1007 (the "Initial Schedules" and "Initial Statement of Affairs"), on which indicated that: (1) they owned a residence, as tenants by the entirety, located at 1474 Cherry Blossom Lane, Webster, New York (the "Residence"), which had a current market value of $202,000.00; (2) David Ptasinski had a retirement plan, administered by the Electricians Union, with a current balance of $76,001.48; (3) they had household goods and furnishings located at the Residence with a value of $2,000.00; (4) David Ptasinski owned a watch with a value of $35.00 and they each had wedding bands with a total value of $200.00 (Schedule B, Question 7 regarding Furs and Jewelry); (5) Canandaigua National Bank ("CNB") held a $50,000.00 collateral security mortgage on the Residence; (6) they leased a 2001 Volvo V70 wagon; (7) they were indebted to Marie A. and Brian Sanderson (the "Sandersons") on a personal loan for approximately $26,000.00; (8) they were potentially liable for $476,377.79 of unsecured debt, the majority of which was incurred in connection with a business that they operated with the Sandersons, known as East Bay Electric, Inc. ("East Bay"); (9) they were both unemployed, and David Ptasinski was drawing unemployment insurance of $1,741.50 per month; and (10) they had no losses from fire, theft, other casualty or gambling within one year immediately preceding the commencement of their case (Question 8 of the Statement of Financial Affairs).

At the Debtors' initial Section 341 Meeting of Creditors (the "Meeting of Creditors") the Sandersons and their attorney appeared.

On April 11, 2002, the Debtors filed an April 10, 2002 Amendment to their Schedule F (the "Schedule F Amendment"),

which added Doerrer Jewelers as an unsecured creditor, which indicated that it had a claim of $4,100.00 for December 2001 purchases.

On May 28, 2002, the Sandersons filed an Adversary Proceeding objecting to the discharge of the Debtors pursuant to Sections 727(a)(2), (a)(4) and (a)(5). The Complaint in the Adversary Proceeding alleged that: (1) on or around October 2000 the Debtors purchased a valuable diamond ring of at least one carat with a value of between $4,000.00 and $7,000.00 (the "Unscheduled Ring"); (2) Maureen Ptasinski continually wore the Unscheduled Ring through the closing of the East Bay business on September 21, 2001; (3) Maureen Ptasinski was not wearing the Unscheduled Ring at the Meeting of Creditors; (4) in response to questioning by the Sanderson's attorney at the Meeting of Creditors, Maureen Ptasinski testified that she did own a small diamond ring of approximately a quarter of a carat, not worth more than $200.00 (the "Engagement Ring"); (5) it was only after the attorney for the Sandersons questioned the Debtors regarding unscheduled jewelry that they amended their schedules to add Doerrer Jewelers as a creditor, however, as of the date of the filing of the Complaint, their schedules had still not been amended to reflect the jewelry purchased from Doerrer Jewelers; (6) the Debtors, with intent to hinder, delay and defraud their creditors and their Chapter 7 trustee (the "Trustee"), failed to properly schedule the Engagement Ring, the Unscheduled Ring or other items, if any, that may have been purchased from Doerrer Jewelers; (7) David Ptasinski had failed to schedule his interest in an Accubid computer software program (the "Accubid Software"), which he had utilized in connection with the operations of East Bay; (8) the Accubid Software had a value of approximately $6,500.00; (9) the Debtors had filed their 2002 income tax returns and scheduled an anticipated refund of $3,750.00, however, because East Bay, a Subchapter "S" corporation, had not filed its 2001 returns, the Debtors knowingly did not have the information regarding, and did not claim on their individual returns, any losses from the operations of East Bay, which may have resulted in significantly greater refunds; (10) the Debtors had failed to wait for and utilize losses from East Bay so that they could file their 2001 returns, obtain any refunds and spend the refunds before they filed their petition; (11) although the Debtors scheduled an indebtedness to John Deere Credit, they failed to schedule their John Deere tractor with snow blower attachment; (12) in connection with the operation of East Bay, David Ptasinski personally purchased a generator for in excess of $1,000.00, however, he did not schedule it as an asset; (13) the Debtors had made false oaths within the meaning and intent of Section 727(a)(4) in filing their Initial Schedules and Initial Statement of Affairs and in testifying at the Meeting of Creditors; and (14) the Debtors had intentionally concealed assets, failed to satisfactorily explain losses of assets and made false oaths so that their discharge should be denied.

On June 19, 2002, the Debtors interposed an Answer which admitted the purchase of a diamond ring weighing at least one carat in October 2000, and advised that the Accubid Software had been repossessed by CNB, as a secured creditor of East Bay.

At a July 18, 2002 pretrial conference, the attorney for the Debtors advised the Court and the attorney for the Sandersons that: (1) Maureen Ptasinski had lost the Unscheduled Ring that had been purchased from Doerrer Jewelers during her pregnancy in the fall of 2001; (2) the Unscheduled Ring had not been insured; (3)

the Debtors had provided the Trustee with a written statement regarding the loss of the Unscheduled Ring, which he was satisfied with; (4) the Debtors had now disclosed Maureen Ptasinski's ownership of the Engagement Ring, and had it appraised for the Trustee; (5) the Debtors had amended their schedules to add Doerrer Jewelers as a creditor in connection with their purchase of the Unscheduled Ring; (6) David Ptasinski had obtained the Accubid Software, in the form of a disk only, from a prior employer that went out of business, however, CNB had repossessed it when the East Bay business closed; (7) the Debtors were working with an accountant to ensure that the East Bay tax returns were filed, and they and their accountant would work with the Trustee to amend their individual returns if warranted; (8) they had not scheduled their John Deere tractor with snow blower attachment because it was secured to John Deere Credit and there was no equity in it; and (9) in September 2001, David Ptasinski sold the generator, which was then eighteen months old, to his father for $400.00.

On August 28, 2002, the Sandersons filed a petition initiating their own Chapter 7 case, and their trustee elected not to pursue the Adversary Proceeding on behalf of their estate.

On September 18, 2002, the Debtors filed a September 12, 2002 Second Amendment of their Schedules and Statements which listed: (1) a .3-carat solitaire with an appraised value of $120.00; (2) a lawn tractor financed through John Deere Credit in fair condition with a value of $2,000.00; and (3) a 1.23 carat diamond ring with an approximate value of $7,500.00, that was lost between September 2001 and February 2002 during Maureen Ptasinski's problem pregnancy.

On November 18, 2002, during a discovery dispute in the Adversary Proceeding, the attorney for the Debtors interposed an Affidavit, which attached a September 27, 2002 Affidavit of Maureen Ptasinski which asserted that: (1) Maureen Ptasinski became pregnant in early March 2001, and she wore the Unscheduled Ring only intermittently in the later part of her pregnancy due to excessive swelling and other pregnancy-related complications; (2) on February 8, 2002, her birthday, when she went to wear the Unscheduled Ring, she could not find it; (3) on Saturday, September 21, 2002, when the Debtors were preparing to relocate to North Carolina and were moving a couch in the basement to donate to The Volunteers of America, they found the Unscheduled Ring under the couch; and (4) on Monday, September 23, 2002, the Debtors notified their attorney that they found the Unscheduled Ring and gave it to him to turn over to the Trustee.

On December 23, 2002, when the Debtors were back in the Rochester area, the Court conducted a trial at which the Sandersons and the Debtors testified.

At trial, Brian Sanderson testified that: (1) he, his wife and the Debtors went into the East Bay business together in May 2000; (2) in April or November 2000, he observed that Maureen Ptasinski had acquired a new single solitaire diamond ring (the "Single Diamond Ring"), which she wore daily until September 2001 when the East Bay business operations were terminated; (3) in early 2001, the Sandersons discovered what they believed to be irregularities in the operation of the business, and they began to lose trust in the Debtors; (4) in March or April 2001, David Ptasinski, individually, purchased a commercial generator from Home Depot which was used by East Bay at a job it was doing at the LeRoy Town Hall; (5) after the LeRoy Town Hall job was completed, David Ptasinski took the generator, which he told Brian Sanderson had cost him be-

tween $1,200.00 and $1,300.00, to the Residence; (6) Brian Sanderson did not see Maureen Ptasinski after the closing of the East Bay business until the Meeting of Creditors; (7) at the Meeting of Creditors Maureen Ptasinski was not wearing the Single Diamond Ring; (8) after the Unscheduled Ring had been turned over to the Trustee, he and Marie Sanderson went to the Trustee's office to see whether the Unscheduled Ring in his possession was the same as the Single Diamond Ring that he had observed Maureen Ptasinski wearing; and (9) the Unscheduled Ring in the possession of the Trustee was not the same as the Single Diamond Ring.

At trial, Marie Sanderson testified that: (1) one day in October or November 2000, Maureen Ptasinski came into the East Bay office, which was at the Residence, wearing the Single Diamond Ring, and was excited to show it off to everyone, explaining that it was just what she always wanted and now had; (2) Maureen Ptasinski was wearing the Single Diamond Ring in September 2001 when the East Bay business operations were terminated; (3) she did not see Maureen Ptasinski again until the Meeting of Creditors; (4) Maureen Ptasinski was not wearing the Single Diamond Ring at the Meeting of Creditors; and (5) the Unscheduled Ring in the possession of the Trustee was not the same ring as the Single Diamond Ring which Maureen Ptasinski had been wearing before the East Bay business was terminated.

At trial, David Ptasinski testified that: (1) the Engagement Ring had been purchased in the late 1980's; (2) the Engagement Ring was the only diamond ring in the Debtors' possession when they filed their petition; (3) Maureen Ptasinski had not acquired an additional ring in the year 2000; (4) the Unscheduled Ring was purchased from Doerrer Jewelers in April 2001, and the Debtors made monthly payments on the balance due to Doerrer Jewelers until October 2001; (5) the Debtors did not list the Unscheduled Ring on their Initial Schedules because at the time of the filing of the petition it was lost; (6) the loss of the Unscheduled Ring was not detailed in Item 8 of the Initial Statement of Affairs because he did not think that the loss needed to be disclosed because it did not result from a fire, theft, casualty or gambling; (7) he executed the Schedule F Amendment which, although it listed Doerrer Jewelers as a creditor, did not disclose that the alleged December 2001 purchase from Doerrer Jewelers, which was for the Unscheduled Ring; (8) he had no satisfactory explanation for why the Unscheduled Ring was not disclosed at the Meeting of Creditors in response to the questions of the Sandersons' attorney regarding the Debtors' jewelry; (9) when the Unscheduled Ring was purchased from Doerrer Jewelers it was mailed to his in-laws in Florida, so that Maureen Ptasinski would not know about it and he could surprise her with it when her parents next came up from Florida to Rochester and brought it with them; (10) the only diamond rings that Maureen Ptasinski ever owned were the Engagement Ring and the Unscheduled Ring; (11) the Debtors did not realize that the Unscheduled Ring was lost until February 8, 2002, when Maureen Ptasinski looked for it to wear it on her birthday; (12) when the Debtors realized that the Unscheduled Ring was lost, they looked all over for it, questioned their children, but did not find it until they moved the couch in September 2002; (13) the Unscheduled Ring was found under a couch in the basement when they were preparing for their move to North Carolina; (14) the Accubid Software was in a gang box that was turned over to CNB, as secured creditor of East Bay, after the Debtors filed their bankruptcy petition;

(15) his father had purchased the generator for $400.00 cash; (16) John Deere Credit had been listed as a creditor, and it was an oversight that the John Deere tractor with snow blower attachment was not scheduled as an asset, however, there was no equity in the tractor; (17) after the Unscheduled Ring was found, the Debtors came to believe that one of their two young daughters must have taken it off Maureen Ptasinski's dressing table where she kept it, and played with it in the basement; (18) he had no real explanation as to why Doerrer Jewelers had not been listed as a creditor; and (19) on February 20, 2002, when the Debtors' petition was filed, he may not have been completely sure that the Unscheduled Ring was permanently lost, and may simply have overlooked scheduling it.

At trial, Maureen Ptasinski testified that: (1) the Debtors had not listed Doerrer Jewelers because Doerrer was a friend of a friend and, although she admitted that they the Debtors never intended to pay him in full after the bankruptcy, they may have intended to make some payments to him and thereafter perhaps amend their schedules to include Doerrer; (2) the Debtors' admission in their Answer to the Complaint and their Response to the Plaintiff's Interrogatories that they had purchased a ring in October 2000, was either a typo, an oversight, the result of not reading the papers clearly, or just confusion on their part; (3) on February 20, 2002, when they filed their petition, she believed that the Unscheduled Ring had been lost forever, because the Debtors had searched everywhere for the Ring and ripped the house apart, although they did not move the couch in the basement, but they had not found it; (4) she kept the Unscheduled Ring on her dressing table during her pregnancy and thereafter, and even though her children had previously played with things on the dressing table

which she did not want them to, she did not take any special steps to safeguard the Unscheduled Ring, but she did tell her children not to touch anything on the dressing table; (5) after she had acquired the Unscheduled Ring, she had put the Engagement Ring away for safekeeping for her daughter; (6) she never owned a diamond ring other than the Engagement Ring and the Unscheduled Ring purchased from Doerrer Jewelers; (7) before looking for the Unscheduled Ring on her birthday on February 8, 2002, the last time she remembers wearing the Ring was in August or September of 2001; (8) her baby was born November 25, 2001; (9) although she had a christening for her new baby at her home in January 2002, she never looked for the Unscheduled Ring to wear it at the christening because she was so busy with the christening and taking care of her three children she never even thought about the Unscheduled Ring; (10) David Ptasinski had acquired the Accubid Software when his prior employer went out of business, and he simply kept the disk that he had used as a bidder for that company; (11) David Ptasinski never paid a licensing fee so that he could legally use the Accubid Software, and the Software was ultimately turned over to CNB; and (12) she believed that the $400.00 received from David Ptasinski's father for the generator was a fair price.

### DISCUSSION

**I. Case Law**

 From the cases which have been decided under Section 727(a)(4)(A), including this Court's Decision & Order in *In re Pierri*, Ch. 7 Case No. 97–20461, A.P. Case No. 97–2125 (W.D.N.Y. April 21, 1998), we know that for the Court to deny a debtor's discharge because of a false oath or account: (1) the false oath or account must

have been knowingly and fraudulently made, *see Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244 (4th Cir.1994); (2) the required intent may be found by inference from all of the facts, *see 6 L.King, Collier on Bankruptcy,* ¶ 727.04[1][a] at 37 (15th ed. rev.1996); (3) a reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of the fraudulent intent necessary to bar a discharge, *see Diorio v. Kreisler–Borg Constr. Co.,* 407 F.2d 1330 (2d Cir. 1969); (4) a false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent, *see Bank of Miami v. Espino (In re Espino),* 806 F.2d 1001 (11th Cir.1986); (5) the required false oath or account must be material; and (6) the required false oath or account may be a false statement or omission in the debtor's schedules or a false statement by the debtor at an examination at a creditors meeting, *see In re Ball,* 84 B.R. 410 (Bankr.D.Md.1988). Conversely, if items were omitted from the debtor's schedules because of an honest mistake or upon the honest advice of counsel, such a false declaration may not be sufficiently knowingly and fraudulently made so as to result in a denial of discharge.

## II. *The Diamond Rings*

### A. *General*

It is undisputed that: (1) when the Debtors filed their petition and Initial Schedules and Statements, they knew that Maureen Ptasinski owned and possessed the Engagement Ring; (2) the Debtors failed to disclose the Engagement Ring as an asset on their Initial Schedules and Statements; and (3) it was only after she was questioned by the Sandersons' attorney at the Meeting of Creditors that Maureen Ptasinski admitted her ownership and possession of the Engagement Ring.

It is undisputed that: (1) when the Debtors filed their petition and Initial Schedules and Statements, David Ptasinski was indebted to Doerrer Jewelers in the amount of $4,100.00 in connection with his purchase of the Unscheduled Ring; (2) David Ptasinski failed to list Doerrer Jewelers as a creditor on the Initial Schedules filed with the Court; and (3) it was only after the commencement of the Adversary Proceeding that the Debtors amended their schedules to include Doerrer Jewelers as a creditor.

It is undisputed that: (1) when the Debtors filed their petition and Initial Schedules, Maureen Ptasinski was the owner of the Unscheduled Ring, in that it had been given to her by David Ptasinski and she never conveyed ownership to a third party; (2) the Debtors failed to disclose the Unscheduled Ring as an asset on their Initial Schedules and Statements; and (3) the Debtors did not disclose that the Unscheduled Ring was allegedly lost on Question 8 of the Initial Statement of Affairs.

### B. *False Oath or Account*

#### 1. *The Unscheduled Ring*

■ From the evidence produced at trial and the pleadings and proceedings in the Debtors' bankruptcy case and in the Adversary Proceeding, I find that Maureen Ptasinski knowingly and fraudulently failed to schedule the Engagement Ring as an asset, and knowingly and fraudulently failed to schedule the Unscheduled Ring as an asset or to disclose, in the Initial Statement of Affairs or otherwise at the Meeting of Creditors, that the Unscheduled Ring was allegedly lost. Furthermore, I find that: (1) at a minimum, the actions of Maureen Ptasinski indicated such a reckless disregard for the serious nature of: (a) complying with her duties under Sec-

tion 521 to pay the necessary attention to the detail and accuracy required to properly complete the Initial Schedules and Statements; and (b) responding correctly and completely to the questions of her Trustee, that fraudulent intent has been demonstrated by a preponderance of the evidence; and (2) the failure of Maureen Ptasinski to include her ownership interest in the Rings in the Initial Schedules and Statements, or to disclose the alleged loss of the Unscheduled Ring, simply could not have been an honest, careless or inadvertent mistake.

Except for the testimony that Maureen Ptasinski may not have worn the Unscheduled Ring at times during her pregnancy, which ended in November 2001, I find all of the other material testimony of the Debtors with respect to the Engagement Ring and the Unscheduled Ring to be so totally without credibility that it is laughable. No one, after observing how Maureen Ptasinski dressed and comported herself at trial could ever believe that such an individual would treat that $7,500.00 diamond Ring as cavalierly as she testified she did, knowing that she: (1) resided in a $200,000.00 suburban home in Webster, New York; (2) leased a 2001 Volvo wagon; (3) had recently run her own business; and (4) after years of wearing a .3–carat diamond ring, finally acquired and flaunted the Unscheduled Ring, the ring she always wanted.

Maureen Ptasinski's stories about: (1) the alleged loss of the Unscheduled Ring; and (2) the reasons for her failure to list, or insist that David Ptasinski list, Doerrer Jewelers as a creditor, or in any way to report the Ring as an asset or as being lost, considering that she allegedly only discovered that the Unscheduled Ring was lost twelve days before the filing of her petition, are more unbelievable than any other story ever told to this Court in a Section 727(a)(4) adversary proceeding.

I further find that David Ptasinski actively participated in this fraudulent failure to schedule or otherwise disclose the details of the alleged loss of the Unscheduled Ring.

The following observations and statements materially contribute to the Court's conclusions that: (1) the Debtors' testimony with respect to the Unscheduled Ring is not credible; (2) the Debtors knew or should have known that the Unscheduled Ring was not "lost" forever but was merely misplaced; and (3) the Debtors should have listed the Unscheduled Ring as a material non-exempt asset on the Initial Schedules, or, at a minimum, its loss should have been disclosed so that the Trustee could investigate and confirm a permanent loss: (a) the testimony of Maureen Ptasinski that when she acquired the Unscheduled Ring she put aside the Engagement Ring for safekeeping for her daughters, but when she could temporarily not wear the Unscheduled Ring during her difficult pregnancy, she did not put the Unscheduled Ring in a safe place, but left it out on her dressing table, and never regularly checked on it; (b) the testimony of Maureen Ptasinski that between the birth of her child in November 2001, after which she could now once again wear the Unscheduled Ring, and her birthday on February 8, 2002, she never checked on the Ring or had occasion to think about wearing it, even though that period covered the Christmas Holidays, New Year's, the christening of the new baby and a celebration of the christening at the Residence; (c) the lack of any plausible explanation by the Debtors as to how the Unscheduled Ring could have been permanently lost rather than merely misplaced, other than that the Debtors' chil-

dren may have played with it; (d) a lack of credible testimony as to how the Debtors could have questioned their children about the loss of the Ring but not get the kind of detailed answers from the children that could reasonably have resulted in their conclusion that the Unscheduled Ring was lost rather than merely misplaced; (e) the Debtors' alleged conclusion that the Unscheduled Ring was permanently lost when they testified that Maureen Ptasinski never wore the Ring in the later stages of her pregnancy, so that it could not have been permanently lost, as can be the case, while washing clothes, doing gardening, washing dishes, shopping at the store, traveling, going to the hospital or doctor's visits; and (f) in view of the foregoing testimony and the Debtors' failure to reasonably conclude when the petition was filed and the Initial Schedules and Statements were completed, that the Ring was simply misplaced somewhere in the house, and that it should be scheduled as an asset, or at least the alleged loss fully explained.

### 2. *The Engagement Ring*

Maureen Ptasinski's testimony that she never refocused on the Engagement Ring or understood that it needed to be scheduled as an asset, in part because she had put it in safekeeping for her daughters, is not credible since: (1) the Debtors specifically and separately scheduled their wedding rings, and presumably knew or had explained to them by their attorney, the difference between an exempt wedding ring and a non-exempt engagement ring, as determined by the Court in *In re Tiberia*, 227 B.R. 26 (Bankr.W.D.N.Y.1998); and (2) Maureen Ptasinski allegedly believed that the Unscheduled Ring was lost.

David Ptasinski's testimony that he did not disclose the loss of the Unscheduled Ring because the loss did not seem to be covered by the literal language of Question 8 of the Initial Statement of Affairs clearly demonstrates his lack of honesty and good faith as a debtor.

### III. *Doerrer Jewelers*

I find that David Ptasinski knowingly and fraudulently failed to list Doerrer Jewelers as a creditor on the Initial Schedules, and that the failure was not an honest, careless or inadvertent mistake. The following observations regarding the testimony presented at trial materially contribute to this conclusion: (1) David Ptasinski was making monthly payments on the obligation up to October 2001; (2) with the alleged loss of the uninsured Unscheduled Ring twelve days before the filing of his petition, David Ptasinski would have been concerned that he would still have to pay the $4,100.00 balance due on the Ring that his wife no longer possessed unless the debt was discharged; (3) he was focused on the Unscheduled Ring in connection with his bankruptcy and the preparation of the Initial Schedules, because he specifically testified that he carefully read and considered Question 8 of the Statement of Affairs and concluded that the loss of the Unscheduled Ring did not have to be disclosed; (4) he had no credible explanation for not scheduling Doerrer Jewelers; and (5) the testimony of Maureen Ptasinski, which he did not contradict, that Doerrer Jewelers was not scheduled because Doerrer was a friend of a friend and, essentially, the Debtors were not sure what they were going to ultimately do with the debt was not credible and was internally inconsistent.

The only reasonable conclusion that the Court can reach, based upon the facts, circumstances and testimony presented, is that the Debtors purposely did not schedule Doerrer Jewelers so that they could

conceal the existence of the Unscheduled Ring from the Trustee and their creditors, knowing that if they scheduled Doerrer Jewelers with a balance of $4,100.00, the Trustee would inquire into what had been purchased at Doerrer Jewelers and fully investigate the alleged loss of the Ring.

Although Courts are generally more concerned with the failure of a debtor to disclose an asset than with the failure to disclose a liability, this is not true in cases such as this where the knowing failure to disclose a creditor is part of a fraudulent scheme to conceal an asset from the Trustee, or to prevent the Trustee from fully investigating the existence or value of an asset.

## IV. *Miscellaneous*

### A. *Sanctions*

The Sandersons have requested that sanctions be imposed against the Debtors for various reasons, including their failures to produce requested discovery information. Although the Court does not condone many of the actions and failures of the Debtors in connection with this Adversary Proceeding, undoubtedly in part because there is so much animosity between the Debtors and the Sandersons, it will not impose sanctions given the fact that the Court has determined to deny the Debtors their discharge.

### B. *Other Unscheduled Assets*

■ The Debtors failed to disclose their John Deere tractor with snow blower attachment and the Accubid Software on their Initial Schedules. The John Deere Credit indebtedness was scheduled, which would and did lead the Trustee to inquire about the John Deere tractor, since to the best of this Court's knowledge, that is all that John Deere Credit finances. Therefore, the failure to schedule the John Deere tractor with snow blower attach-

ment in itself is not sufficient to deny the Debtors' discharge. However, their reckless disregard for the accuracy of their Initial Schedules is further indicated by that failure.

■ In view of the fact that David Ptasinski was apparently illegally utilizing the Accubid Software in connection with the operations of East Bay, because he had not paid the required licensing or royalty fees to be legally entitled to use the disk which he inherited from his former employer, the Software, later turned over to CNB, was arguably not even an asset of the estate. It certainly was not an asset that the Trustee could realize upon, since David Ptasinski had not acquired it legally or taken the necessary steps to have legal possession and use of the Software. Therefore, the failure to schedule the Software in itself is not sufficient to deny David Ptasinski's discharge.

## V. *Overview*

As this Court has often stated, the benefits received by an honest debtor in a bankruptcy case, including a discharge of all dischargeable debts, a "fresh start," are extraordinarily disproportionate to the few demands and expectations placed upon a debtor by the Bankruptcy Code and Rules. One of these few, but very important duties, which is seemingly easy for any debtor, even a consumer or typical individual debtor to perform, is to ensure that all of their assets are properly scheduled.

■ Further, as this Court has clearly stated on numerous occasions to debtors and their attorneys, notwithstanding all of the financial and perhaps personal difficulties that a debtor may be experiencing, the Bankruptcy Code expects that when debtors and their attorneys are finalizing and signing their schedules, they will devote their full attention to them in order

to ensure that they are complete and accurate to the best of the debtor's knowledge and information. Section 727 was enacted, in part, to prohibit a discharge and a fresh start for those who "play fast and loose with their assets or with the reality of their affairs." *In re Tully*, 818 F.2d 106, 110 (1st Cir.1987).

## CONCLUSION

It has been proved by a preponderance of the evidence that the Debtors have made one or more material false oaths or accounts in completing the Initial Schedules and Initial Statement of Affairs and testifying at the Meeting of Creditors and at trial. These false oaths or accounts were knowingly and fraudulently made, or were made with such reckless disregard for both the serious nature of the information being sought and the necessary attention to detail and accuracy required in completing their Initial Schedules and Initial Statement of Affairs and answering questions asked at the Meeting of Creditors and the trial, that fraudulent intent is clearly indicated. Furthermore, there is no credible evidence that the false oaths or accounts were made by mistake, carelessness or inadvertence, or upon the honest advice of counsel. The discharges of both Maureen Ptasinski and David Ptasinski are hereby denied pursuant to Sections 727(a)(2)(B) and (4)(A).

**IT IS SO ORDERED.**