In re Peter Lu Hu BALL, Debtor.

NERCO COAL CORP., f/k/a Nerco Coal Company, Nerco Coal Sales Company, Wesmar Coal, Inc., and NDG, Inc., f/k/a Nerco–Hiller Coal Company, Plaintiffs,

v.

Peter Lu Hu BALL, Defendant.

Bankruptcy No. 87–40477.
Adv. No. 87–0160–A.

United States Bankruptcy Court,
D. Maryland.

March 3, 1988.

Jeffrey M. Axelson, Steven E. Mirsky, Rockville, Md., for debtor.

William Eric Minamyer, Cincinnati, Ohio, Charles Lee Eisen, Washington, D.C., for Nerco Coal Corp., et al.

## MEMORANDUM OPINION

A. THOMAS SMALL, Bankruptcy Judge.

In this adversary proceeding, the plaintiffs, Nerco Coal Corp., f/k/a Nerco Coal Company, Nerco Coal Sales Company, Wesmar Coal, Inc. and NDG, Inc., f/k/a Nerco–Hiller Coal Company, ("NERCO") object to the discharge of the chapter 7 debtor, Peter Lu Hu Ball, under 11 U.S.C. §§ 727(a)(2), (3), (4) and (5), and request that a judgment against the debtor in the amount of $1,750,-000 be determined to be non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).[1] The trial was held in Rockville, Maryland, on January 11–13, 1988.

### JURISDICTION

This bankruptcy court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157, and Local Rule 51 of the United States District Court for the District of Maryland (effective April 1, 1985).

This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).

### FACTS

Peter Lu Hu Ball filed a voluntary petition under chapter 7 of the Bankruptcy Code on February 27, 1987.

NERCO is the debtor's primary creditor with an unsatisfied judgment of $1,750,000 which arose from NERCO's transactions with Pierce Coal Sales International, Inc. ("Pierce Coal").

Pierce Coal was formed by Mr. Ball in 1983 and engaged in the coal brokerage business. Pierce Coal was initially owned by the debtor (20%), the debtor's wife, Carol Chen Ball (40%), and the debtor's mother, Lu Hu Chuen Ball (40%). Although Mr. Ball only held 20% of the company's ownership in his name, he had exclusive control over the company and directed all aspects of the company's affairs.

In January, 1984, Pierce Coal obtained a contract with the United States Government (Exhibit "P–3") to provide coal to four military bases—Charleston Naval Base, Camp Lejeune Marine Corps Base, Cherry Point Marine Corps Air Station, and Rickenbacker Air National Guard Base. Pierce Coal entered into a subcontract with NERCO[2] which provided for NERCO to supply and ship the necessary coal to the bases and provided for Pierce Coal to be paid a brokerage fee of 50¢ per ton of coal supplied (Exhibits "P–1" and "P–2"). Over $2,300,000 of coal was shipped by NERCO to the military bases pursuant to the contracts.

The subcontract between Pierce Coal and NERCO required Pierce Coal to maintain a "lockbox" account in the name of Pierce Coal with Citizens and Fidelity Bank and Trust of Louisville, Kentucky ("Bank") to receive all payments from the government for coal delivered by NERCO. The subcontract further provided that only NERCO

---

1. Count five of the complaint containing allegations of false financial statements was dismissed as a result of the debtor's motion for summary judgment; count twelve relating to the debtor's employment in family businesses was voluntarily dismissed.

2. The original subcontract was between Pierce Coal and two companies, Hiller Fuels, Inc. and Hiller Coal Company; the Hiller companies were subsequently acquired by NERCO.

was to have access to the "lockbox" account.

The account was opened by Pierce Coal and the government was directed to make payments to the lockbox account, but on July 31, 1984, and again on February 5, 1985, Mr. Ball on behalf of Pierce Coal wrote to the government's Defense Fuel Supply Center and changed the remittance instructions. Mr. Ball's letter of July 31, 1984, (Exhibit "P–4") directs the government to send the payments for shipments to Charleston and Camp Lejeune to Pierce Coal at Pierce Coal's office address (1018 Vermont Avenue, N.W., Washington, D.C.). The letter of February 5, 1985, (Exhibit "P–5") directs the government to make payments for shipments to Cherry Point to Pierce Coal at the debtor's personal residence (10610 Barnwood Lane, Potomac, Maryland). The changes in the remittance procedure were made without the knowledge or consent of NERCO.

As a result of these changes, only $282,-906.27 of the more than $2,300,000 in government payments went to the lockbox account and were ultimately received by NERCO (see Exhibit "P–8" attachment 4). The balance flowed directly to Pierce Coal.

Mr. Ball contends that NERCO was late in its deliveries to Charleston Naval Shipyard and that he changed the remittance procedure so that Pierce Coal would have leverage over NERCO in resolving any dispute concerning the default. Mr. Ball's testimony in this regard, however, is unconvincing. Although there is evidence that NERCO was late in making some shipments, any default on NERCO's part was greatly overshadowed by the misconduct of Mr. Ball and Pierce Coal. Mr. Ball did not merely hold the funds to help Pierce Coal's negotiating position with NERCO; he used the funds for his own benefit and for the benefit of his family. For example, he purchased two new Mercedes automobiles

(checks #160, 161 and 163 totalling more than $80,000 drawn in April, 1985 on the Pierce Coal account with the Fund for Government Investors), paid personal loans (e.g., payments from the Pierce Coal account with the Fund for Government Investors to Household Finance in September, October, and November totalling $147,-061.19—Exhibit "P–19"), invested in an apartment project (at least $100,000 was invested in the "1636 Connecticut Avenue Limited Partnership" in the name of the debtor's wife), and paid expenses of a family restaurant.[3]

Pierce Coal also used these funds to make an extraordinary purchase—two bonds in "Carboneros International, Inc.," a Panamanian corporation. The first bond (Exhibit "P–15") is dated March 15, 1985, and has a face value of $200,000; the second bond (Exhibit "P–16") is dated May 30, 1986, and has a face value of $1,013,000. Both bonds accrue interest at the rate of 18% per annum but pay no interest or principal until the bonds mature fifteen years after the date of issuance (maturing on March 16, 2000, with respect to the first bond and on May 31, 2001, with respect to the other bond).

Mr. Ball maintains that Pierce Coal bought the bonds to get into the international coal brokerage business. According to Mr. Ball, Pierce Coal's ownership of the bonds would permit the company to obtain credit from Carboneros' Luxembourg bank. Mr. Ball's explanation is implausible and the circumstances surrounding the purchase of the bonds make the transaction all the more dubious. The funds to purchase the bonds were sent by wire to a Luxembourg bank (the following transfers were made to the Luxembourg bank: 05/09/86—$190,000; 05/12/86—$160,000; 05/27/86—$330,000; 06/17/86—$333,000— Exhibit "P–19"). There is no other documentary evidence of the purchase of the

---

**3.** These transactions are but a few of those reflected in the banking records for Pierce Coal's account with The Riggs National Bank (Exhibit "P–10"), Pierce Coal's account with American Security Bank, N.A. (Exhibit "P–11"), Pierce Coal's account with the Fund for Government Investors (Exhibits "P–18" and "P–19"), and various other accounts for the debtor, Andrew Ball, Trudy Ball, Michael Ball, Timothy Ball, BLH Associates, Inc., and 1636 Connecticut Avenue (Exhibits "P–20–30"), which show Mr. Ball's control of the funds, and his use of those funds for the benefit of his family.

bonds except for two xerox copies of the bonds themselves (Exhibits "P–15–16").

Mr. Ball stated at the meeting of creditors in this case held on April 6, 1987, that the records relating to the bonds were destroyed in a fire in August, 1986. The offices for Pierce Coal were located in a building which also included the Empress Restaurant owned by the debtor's mother. According to Mr. Ball's testimony at the § 341 meeting, a fire broke out on the fourth floor where the Pierce Coal office was located, the fire department hosed down the entire floor, Pierce Coal's records were destroyed due to the fire, water, and smoke, and firemen took the records to the street for disposal. (Exhibit "P–31"). W.F. Drummond, the fire inspector who witnessed and investigated the fire, testified that the fire was started in a grease cooker and was contained to a small area (see report Exhibit "P–32"). The inspector observed the Pierce Coal office and testified that there was no smoke or water damage to Pierce Coal's property, and that the fire department had not removed anything belonging to Pierce Coal. Inspector Drummond has over twenty-five years experience with the District of Columbia Fire Department and was an impressive witness. The court believes the inspector's testimony concerning the fire and does not find credible the testimony of Mr. Ball in that regard.

Mr. Ball has not satisfactorily explained any aspect of the Panamanian bonds.

On September 25, 1986, Mr. Ball and Pierce Coal entered into a settlement agreement (Exhibit "P–38") with NERCO which resolved a suit brought by NERCO in the United States District Court for the District of Columbia and a suit brought by NERCO against Mr. Ball in the United States District Court for the Southern District of Ohio. Pursuant to the agreement, Pierce Coal was to pay NERCO $1,750,000 plus interest on or before November 20, 1986. Mr. Ball guaranteed the payment by Pierce Coal and when payment was not made, a judgment was entered against Mr. Ball in the United States District Court for the District of Columbia on December 12, 1986.

Mr. Ball filed his voluntary petition under chapter 7 of the Bankruptcy Code on February 27, 1987, and a timely adversary proceeding objecting to Mr. Ball's discharge and seeking to except the $1,750,000 debt from the discharge was brought by NERCO. NERCO has done an impressive job of documenting the debtor's misconduct in connection with NERCO/Pierce Coal contracts and this bankruptcy case.

After applying the "clear and convincing" evidentiary standard, the court finds that the debtor willfully and maliciously injured the plaintiff, NERCO, by converting funds in excess of $1,750,000 which should have been made available to NERCO. Mr. Ball, without NERCO's knowledge and consent, caused funds to be diverted from the "lockbox" account so that the funds could be used by Pierce Coal, the debtor, and the debtor's family. Mr. Ball's actions were deliberate, intentional, and deceitful. These acts were also done by Mr. Ball in knowing disregard of NERCO's rights. Pierce Coal had virtually no assets other than the funds it diverted from NERCO. Once the funds come into the Pierce Coal account, Mr. Ball used the funds as his own.

The court also finds, based on clear and convincing evidence, that Mr. Ball knowingly and fraudulently made a false oath in connection with this case. Specifically, Mr. Ball testified at his meeting of creditors that the records of Pierce Coal had been destroyed by fire and had been disposed of by firemen. That testimony is patently false. Undoubtedly the records of Pierce Coal have a material bearing of the affairs of the debtor since the business dealings of Pierce Coal and the debtor were so inseparably intwined.

Furthermore, the court finds that the debtor has failed to explain satisfactorily the loss of assets as required by 11 U.S.C. § 727(a)(5). Mr. Ball's explanation that the misappropriated funds were used to purchase Panamanian bonds maturing in fifteen years is simply not believable. There are no credible documents to support that

explanation. The evidence only shows that funds went from Peter Lu Hu Ball's account to the account of Pierce Coal and then on to a Luxembourg bank—that is not enough.

In view of the overwhelming evidence with respect to the elements of 11 U.S.C. §§ 523(a)(6), 727(a)(4)(A) and 727(a)(5), the court will not make specific findings concerning the elements of 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), 727(a)(2), or 727(a)(3).[4]

## DISCUSSION AND CONCLUSIONS

### Burden of Proof

The burden of proof in a complaint objecting to discharge is on the plaintiff. Bankruptcy Rule 4005. The bankruptcy rules do not say who has the burden of proof with respect to a determination of dischargeability, but the cases have generally placed the burden on the party objecting to the dischargeability of the debt. *Matter of Benich*, 811 F.2d 943 (5th Cir. 1987); *Matter of Long*, 794 F.2d 928 (4th Cir.1986); *In re Black*, 787 F.2d 503 (10th Cir.1986); *In re Hunter*, 780 F.2d 1577 (11th Cir.1986). The standard of proof to establish an exception to discharge of a debt is "clear and convincing evidence." *Matter of Bogstad*, 779 F.2d 370 (7th Cir. 1985); *American Honda Finance Corp. v. Loder*, 77 B.R. 213 (N.D.Iowa 1987).[*]

### Section 523(a)(6)

11 U.S.C. § 523(a)(6) provides that the discharge does not include any debt:

for willful or malicious injury by the debtor to another entity or to the property of another entity.

In *St. Paul Fire & Marine Insurance Co. v. Vaughn*, 779 F.2d 1003 (4th Cir. 1985), the Fourth Circuit held that specific malice is not required under § 523(a)(6). The court affirmed its holding in *Bennett v. W.T. Grant*, 481 F.2d 664 (4th Cir.1973), decided under the Bankruptcy Act, in which the court held " 'if the act of conversion is done deliberately and intentionally in knowing disregard of the rights of another, it falls within the statutory exclusion [from discharge in bankruptcy].' 481 F.2d at 665." *Vaughn*, 779 F.2d at 1008. In *Vaughn* the court specifically rejected the idea that Congress, in enacting § 523(a)(6), had completely overruled *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1902), citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 365, U.S. Code Cong. & Admin. News 1978, p. 5787.

The Ninth Circuit in *In re Cecchini*, 780 F.2d 1440 (9th Cir.1986), also adopted a similar view of "willful and malicious." "When a wrongful act such as conversion, done intentionally, necessarily produces harm and is without just cause or excuse, it is 'willful and malicious' even absent proof of a specific intent to injure." *Id.* at 1443.

In the present case, the subcontract for the sale of coal was between Pierce Coal and NERCO and the debtor contends that since he was only an officer of the company, § 523(a)(6) should not apply to him. The fact of the matter, however, is that Mr. Ball completely dominated Pierce Coal and the misappropriated funds were used for Mr. Ball's personal benefit. Furthermore, Mr. Ball's liability to NERCO was established by the $1,750,000 judgment. *See Ford Motor Credit Co. v. Owen*, 807 F.2d 1556 (11th Cir.1987), in which the court

---

4. At the conclusion of the trial, the court indicated from the bench that NERCO had not met its burden of proof with respect to these issues. After further reflection, the court is of the opinion that there may be sufficient evidence to support a finding that the debt arises from larceny as that term is used in 11 U.S.C. § 523(a)(4). The court, however, has not analyzed the applicable state and federal laws with respect to larceny. Furthermore, it is now apparent to the court that the issue presented under 11 U.S.C. § 727(a)(2) is closer than originally indicated.

* After the trial of this proceeding, the United States Court of Appeals for the Fourth Circuit decided *Combs v. Richardson*, 838 F.2d 112 (4th Cir.1988), in which the court held that the standard of proof with respect to proceedings to determine dischargeability under 11 U.S.C. § 523 is preponderance of the evidence, not clear and convincing evidence. Since the court has found that the plaintiffs have satisfied a higher standard of proof than required by the Fourth Circuit in *Combs*, that decision has no effect on the outcome of this proceeding.

held that a debtor's official capacity with a corporation and active participation in conversion by the corporation would cause the debtor to be personally liable for the conversion and that debt to be nondischargeable under 11 U.S.C. § 523(a)(6).

*Section 727(a)(4)(A)*

■ 11 U.S.C. § 727(a)(4) provides that a debtor is not entitled to a discharge if the debtor has knowingly and fraudulently made a false oath in or in connection with the bankruptcy case.

The purpose of this section is to insure that debtors provide reliable information to those with an interest in the administration of the debtor's estate. *In re Shebel*, 54 B.R. 199, 202 (Bankr.D.Vt.1985); *In re MacDonald*, 50 B.R. 255, 259 (Bankr.D.Mass.1985). Creditors are entitled to truthful statements in a debtor's statement of financial affairs so that they may conduct their own investigations of those affairs. *In re Cycle Accounting Services*, 43 B.R. 264, 272 (Bankr.E.D.Tenn.1984). A material omission from a debtor's sworn statement of affairs or schedules presents grounds for denying a discharge under 11 U.S.C. § 727(a)(4)(A). *In re Chalik*, 748 F.2d 616, 618 n. 3 (11th Cir.1984); *In re Bobroff*, 58 B.R. 950, 953 (Bankr.E.D.Pa. 1986); *In re Cline*, 48 B.R. 581, 584 (Bankr.E.D.Tenn.1985).

*In re Ingle*, 70 B.R. 979, 983 (Bankr.E.D.N. C.1987).

In *Williamson v. Fireman's Fund Insurance Co.*, 828 F.2d 249, 251 (4th Cir. 1987), the court stated that for a debtor to be denied a discharge under § 727(a)(4) "the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud." (citing 4 L. King, *Collier on Bankruptcy* ¶ 727.04[1], at 727–54 to–55 (15th ed. 1987)). The court also held that whether a debtor has made a false oath is a question of fact.

In upholding the denial of the debtor's discharge under § 727(a)(4)(A), the court in

*Williamson* cited *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984), which states: "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."

In this proceeding it is clear that Mr. Ball made a false oath in connection with a material fact when he explained that the records of Pierce Coal had been destroyed by fire.

*Section 727(a)(5)*

■ 11 U.S.C. § 727(a)(5) provides that a debtor is not entitled to a discharge if: the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

Once the plaintiff meets the initial burden of producing evidence to prove the facts to establish the objection, the burden of going forward with the evidence that will "explain satisfactorily" the losses or deficiencies shifts to the debtor. 4 L. King, *Collier on Bankruptcy*, ¶ 727.08, at 727–73 (15th ed. 1986).

The court found that Mr. Ball's undocumented explanation that more than $1,000,000 funneled to a Luxembourg bank was used to purchase bonds of a Panamanian corporation was not plausible. Consequently, the debtor has not satisfactorily met his obligation under § 727(a)(5).

*The Preclusive Effect of the Settlement Agreement and the Judgment as Res Judicata*

■ The debtor contends that NERCO released all claims against the debtor by virtue of the settlement agreement entered into between the parties on September 25, 1986.[5] NERCO, however, is not attempting to enforce claims that were released; it is merely trying to enforce claims which were established by the judgment.

---

**5.** Chief Judge Mannes rejected this argument when considering the debtor's motion for summary judgment.

There is also no merit to the debtor's claim that NERCO's judgment for $1,750,000 precludes a determination by this court concerning the debtor's discharge and dischargeability of the $1,750,000 debt. The issues which are now before this court were not resolved by the judgment and were not necessary to a determination of the debtor's obligation to NERCO.

Based on the foregoing, the court concludes that the debtor's debt to NERCO as set forth in the judgment dated December 12, 1986, is nondischargeable pursuant to 11 U.S.C. § 523(a)(6) and that the debtor's discharge should be denied pursuant to 11 U.S.C. §§ 727(a)(4)(A) and 727(a)(5). An appropriate judgment will be entered.