**In re Diane M. WEEDEN, Debtor.**

**Bracket R. Brock, Plaintiff,**

v.

**Diane M. Weeden, Defendant.**

**C. Bruce Lawrence, as Trustee, Plaintiff,**

v.

**Diane M. Weeden, Defendant.**

**C. Bruce Lawrence, as Trustee, Plaintiff,**

v.

**Delmar E. Weeden and Gloria J. Weeden, Defendants.**

**Bankruptcy No. 02–23812. Adversary Nos. 03–2002, 03–2003, 03–2049.**

United States Bankruptcy Court, W.D. New York.

Feb. 17, 2004.

**452**

Diane M. Weeden, pro se, for Debtor.

Cynthia L. Snodgrass, Rochester, NY, for Plaintiff Bracket R. Brock.

C. Bruce Lawrence, Boylan, Brown, Code, Vigdor & Wilson, LLP, Rochester, NY, pro se.

## DECISION & ORDER

JOHN C. NINFO, II, Chief Judge.

### BACKGROUND

On September 30, 2002, Diane M. Weeden (the "Debtor") filed a petition initiating a Chapter 7 case. On the Schedules and Statements required to be filed by Section 521 and Rule 1007, the Debtor indicated: (1) on Schedule A—Real Property, that she owned no real property; (2) on Schedule B—Personal Property: (a) Item No. 7, furs and jewelry, that she owned a watch with a value of $30.00 and miscellaneous costume jewelry with a value of $70.00; (b) Item 11, interests in pension or profit sharing plans, that she had an exempt 401K account with Mutual Services Corp., with a balance of $222,000.00; (c) Item No. 14, other negotiable and non-negotiable instruments—that she had none; (d) Item No. 17, other liquidated debts owing debtor including tax refunds—that she had none; and (e) Item No. 33, other personal property of any kind—that she had none; (3) on Schedule F—Creditors Holding Unsecured Nonpriority Claims, that she had $46,178.00 in such claims, including: (a) a July 2002 $16,351.00 judgment in favor of Bracket R. Brock ("Brock") for attorney's fees (the "Attorney's Fee Judgment"); and (b) a July 2002 $15,928.00 judgment in favor of Brock for child support arrears (the "Child Support Judgment"); (4) on Schedule I—Current Income, that she was employed as a customer service representative at Adecco with a monthly gross salary of $1,100.00; (5) on her Statement of Financial Affairs, Question 3A, payments to creditors, that she had made no payments on loans to creditors within ninety days prior to the filing of her petition; and (6) on her Statement of Financial Affairs, at Question 10, list all other property, other than property transferred in the ordinary course of business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case, that she had made no such transfers.

On January 3, 2003, Brock commenced an Adversary Proceeding against the Debtor (the "Brock Discharge Proceeding"), which asserted that: (1) the Child Support Judgment was nondischargeable pursuant to Section 523(a)(5), because it was in the nature of support (the "Brock Nondischargeability Proceeding"); and (2) the Debtor's discharge should be denied under Section 727, for various reasons including that: (a) she had failed to disclose on her schedules that she owned a diamond ring with a value in excess of $6,000.00 (the "Diamond Ring"); and (b) on or about July 23, 2001, she had fraudulently transferred property at 46 Walnut Hill Drive, Penfield, New York (the "Walnut Hill Property") to her parents, Delmar Weeden and Gloria Weeden.

On January 3, 2003, the Debtor's trustee, C. Bruce Lawrence, Esq. (the "Trustee") commenced an Adversary Proceeding against the Debtor pursuant to Section 727 (the "Trustee Discharge Proceeding"), which asserted that her discharge should be denied for various reasons including that: (1) she failed to disclose in her schedules that she owned or transferred the Diamond Ring; and (2) she transferred the Walnut Hill Property to her parents with the actual intent to hinder, delay and defraud creditors, including Brock.

On March 31, 2003, the Trustee commenced an Adversary Proceeding (the "Walnut Hill Proceeding") against the Debtor's parents which asserted that the transfer of the Walnut Hill Property to them was an avoidable fraudulent conveyance made without fair consideration and with the actual intent to hinder, delay and defraud creditors.

After the Court conducted various pretrial conferences and heard and decided a number of motions, including motions for the dismissal of the three Adversary Proceedings and the Debtor's Chapter 7 case itself, and motions for summary judgment, trials of the Adversary Proceedings were held on November 25, 2003.

At the trial of the Brock Nondischargeability Proceeding, both Brock and the Debtor testified. At trial Brock asserted, as he and his attorney had asserted at various pretrial proceedings, that in addition to the Child Support Judgment, the Court should also determine that the Attorney's Fee Judgment was nondischargeable because it was in the nature of support. Brock essentially testified that: (1) in early 2001 he commenced an action against the Debtor to obtain sole custody of their son, Connor, along with an award of child support and costs and expenses, after the Debtor had relocated to Florida with Connor without complying with the requirements contained in the separation agreement that had been incorporated into the divorce decree; (2) the Child Support Judgment resulted from hearings which were completed on July 23, 2001 in the Monroe County Supreme Court before Justice John Ark ("Judge Ark"); and (3) in June 2001, he was laid off from his employment, but was re-employed in September 2001; (4) he was again laid off in October 2002 and was currently unemployed; (5) in July 2001, he was unemployed, owned a 1993 Nissan truck, had some equity in a six and one-half acre campsite that he paid $5,000.00 for in 1993, and lived with his parents and shared some of the household expenses; and (6) the award of attorney's fees, as evidenced by the Attorney's Fees Judgment, was necessary for him to be able to support himself and Connor, since if he were required to pay those attorney's fees he could not support himself and Connor, even if the Child Support Judgment was paid.

At the trial of the Brock Nondischargeability Proceeding, Weeden testified as a

pro se litigant, that she believed that the Attorney's Fee Judgment was not in the nature of support because: (1) at the time of the award[1] Brock was earning an annual salary of approximately $57,000.00 and lived with his parents where he incurred minimal living expenses; and (2) to the extent that the award may have been characterized as support, it was because Brock's attorneys had indicated to the State Court that they had no confidence that any award of attorney's fees would actually be paid by the Debtor.

At the trial of the Discharge Proceedings brought by Brock and the Trustee, the Plaintiffs asserted that the Debtor's discharge should be denied because: (1) she transferred the Walnut Hill Property to her parents in July 2001 with the actual intent to hinder, delay and defraud creditors; (2) she failed to disclose the Diamond Ring on her schedules, which the Trustee and Brock believed she still owned, because: (a) she had no records or other satisfactory evidence that she had sold the Ring to Clem Naglee in September 2002 as she claimed; and (b) a post-petition e-mail from her to Brock indicated that she still had possession of the Ring; (3) she failed to disclose that she paid off, in whole or in part, a Citibank Mortgage (the "Citibank Mortgage") on the Walnut Hill Property within ninety days of filing her petition; and (4) if there had ever been a valid legal and equitable transfer of the Walnut Hill Property to her parents, the Debtor had failed to disclose as an asset on her schedules the $200,000.00 promissory note (the "Walnut Hill Note") that was executed and delivered by her parents as part of the purchase price.

At the trial of the Discharge Proceedings brought by Brock and the Trustee,

Brock, the Debtor and Gloria Weeden testified.

Brock essentially testified that: (1) he had purchased the Diamond Ring as an engagement ring for the Debtor prior to their 1996 marriage; (2) he had paid $6,500.00 for the Diamond Ring; (3) he had received an October 23, 2002 post-petition e-mail from the Debtor offering to transfer the Diamond Ring to him in connection with a settlement of the Child Support Judgment; (4) the Debtor had seen Trial Exhibit 16, a $12,268.80 appraisal of the Ring at the time that he purchased it; and (5) he believed that the Debtor was in possession of the Diamond Ring when he received the October 23, 2002 e-mail and that she continued to be in possession of the Ring at the time of trial.

The Debtor testified that: (1) she had earned a B.S. degree in computer science from the University of Wisconsin and an M.B.A. from the Rochester Institute of Technology, and that she had been a software engineer and project leader at Xerox Corporation where she was employed for approximately sixteen years; (2) the Diamond Ring had been listed as having an $8,000.00 value on the December 19, 2000 Statement of Net Worth that she filed with the Monroe County Supreme Court in connection with her divorce; (3) she sold the Diamond Ring in September 2002 to a Xerox Corporation employee, Clem Naglee, for $750.00 so that she could pay her rent; (4) she had no record of the sale to Clem Naglee, and had not attempted to produce him at trial to testify to the alleged sale; (5) although she had indicated in the October 23, 2002 e-mail to Brock that she would transfer the Diamond Ring to him in connection with a proposed set-

---

1. The award was made approximately one year after the hearing was closed in July 2001.

tlement, she did not possess the Ring at that time, and had offered it to Brock to demonstrate that his only concern was for money and not for the well-being of Connor; (6) she was the obligor on the Citibank Mortgage which had not been paid off when she transferred the Walnut Hill Property to her parents in July of 2001; (7) she had continued to pay the regular monthly payments on the Citibank Mortgage until approximately August of 2002; (8) the deed to her parents of Walnut Hill was filed on July 23, 2001, because she was in town in connection with the custody and child support hearings involving Connor; (9) her parents had never paid her the balance due on the Walnut Hill Note; (10) she had transferred the Walnut Hill Property to her parents because: (a) her parents had lost money in the stock market and required additional income to meet their living expenses; and (b) since she would otherwise have given them the additional monies they needed to meet their living expenses, it made more sense to transfer the income-producing Walnut Hill Property to them because they were in a lower tax bracket and, therefore, could derive more net income from the rental stream of the Property; (11) her parents had made a number of $666.00 monthly interest payments on the Walnut Hill Note; (12) at the time of the filing of her petition and the execution of her schedules, as well as on the date of trial, her parents had not actually paid the balance due on the Walnut Hill Note because the principal balance was not due; (13) after the transfer of the Walnut Hill Property to her parents, she continued to pay the monthly payments on the Citibank Mortgage on Walnut Hill until approximately January of 2002, and in approximately August of 2002 she provided her parents with approximately $20,000.00 from the liquidation of some of her investments, so that they could pay off the Citibank Mortgage;

(14) her parents had sold the Walnut Hill Property and later built and closed on 90 Logans Run ("Logans Run") where she now resided rent free; (15) her ability to live rent free at Logans Run constituted a partial offset against the amounts due on the Walnut Hill Note; and (16) any inaccuracies in her schedules were the fault of her bankruptcy attorney, Kevin Bryant, Esq., who subsequent to the filing of her petition and before the trials was indicted for the murder of his spouse and remained incarcerated.

Gloria Weeden essentially testified that: (1) the approximate $51,000.00 balance due on the Citibank Mortgage was paid off from funds she received from the Debtor, in the approximate amount of $20,000.00, and funds she supplied from liquidating some of her annuities which she acquired from the proceeds of their former residence when Delmar Weeden retired and they moved to Florida (the "Annuities"); and (2) in July 2002, she and Delmar Weeden contracted to build Logans Run, which she believed was an offset against the amounts due on the Walnut Hill Note, because it was built and acquired primarily for the Debtor to live there.

At the trial of the Walnut Hill Proceeding, Weeden, Delmar Weeden and Gloria Weeden testified.

Delmar Weeden testified that in July of 2001:(1) he and Gloria Weeden had no savings, pensions, 401K accounts, bonds, or real estate, other than their home in Florida, which they purchased for $237,500.00 in 1998 for cash with no mortgage; (2) he and Gloria Weeden were having problems meeting their living expenses, and they agreed to transfer the Walnut Hill Property because they understood from the Debtor that it would be better for them to own the property than for the Debtor to continue to own it and help them with their living expenses from

the after tax income from the property; (3) he and Gloria Weeden had established a revocable trust which had assets in its name consisting of their Florida home and their automobile; (4) he and Gloria Weeden were receiving combined monthly social security income of $1,800.00, or $21,600.00 annually; (5) he and Gloria Weeden had no investments, other trusts or mutual funds; (6) after the transfer of the Walnut Hill Property, he and Gloria Weeden received the approximately $1,900.00 monthly rents, deposited the rents into a special rent account (the "Rental Account"), and wrote a monthly check to the Debtor for the required interest payments on the Walnut Hill Note; (7) they sold the Walnut Hill Property in May of 2003; (8) they closed on Logans Run in approximately December of 2003; (9) title to Logans Run was in a revocable trust in the name of Delmar and Gloria Weeden (the "Logans Run Trust"), and a first mortgage of $118,000.00 on the property was also executed by the Trust (the "Logans Run Mortgage"); and (10) they purchased Logans Run so that the Debtor would have someplace to live and they would have a place to stay when they came north in the summers.

Gloria Weeden essentially testified that: (1) she and Delmar Weeden received a cashiers check in connection with the sale of the Walnut Hill Property in the approximate amount of $209,000.00 (the "Walnut Hill Proceeds"), which they deposited into the Rental Account; (2) the Walnut Hill Proceeds and other amounts on deposit in the Rental Account would allow them to pay any capital gains taxes incurred in connection with the sale of the Walnut Hill Property; (3) she was paying the monthly payments on the Logans Run Mortgage by cashing in some of the Annuities; (4) the Logans Run Trust was established to avoid probate; (5) the $35,000.00 down payment for Logans Run was made by cashing in some of the Annuities; and (6) in the absence of any rental income from the Walnut Hill Property or from Logans Run, she and Delmar Weeden were meeting any shortfalls in their monthly living expenses by cashing in more of the Annuities.

## DISCUSSION

### I. *The Brock Nondischargeability Proceeding*

#### A. Section 523(a)(5) and Case Law

Section 523(a)(5) provides that:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt -

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

(A) such debt is assigned to another entity, voluntarily, by operation of law, or otherwise (other than debts assigned pursuant to section 402(a)(26) of the Social Security Act, or any such debt which has been assigned to the Federal Government or to a State or any political subdivision of such State); or

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support.

11 U.S.C. § 523 (2003).

■ From the cases that have been decided under Section 523(a)(5), including this Court's Decision & Order in *In re*

*Anderson, IV*, 300 B.R. 831 (Bankr. W.D.N.Y.2003), we know that in determining whether a state court award of attorney's fees is nondischargeable support, the Bankruptcy Court must look to the intent of the state court that rendered the award, and if the court's intent is unclear, then it should examine the function of the award in light of the relative circumstances of the parties. *See In re Jarrell*, 251 B.R. 448 (Bankr.S.D.N.Y.2000).

## B. The Child Support Judgment

■ The Child Support Judgment is contained in one of the ordering paragraphs in Justice Ark's June 26, 2002 Order (the "State Court Order") (Plaintiff's Exhibit 12 at trial). In the State Court Order, Justice Ark sets forth a detailed New York State Child Support Standards Act (the "CSSA") calculation that forms the basis for his awards of prospective support, from March 4, 2002 forward in the amount of $201.00 per week, as well as the Child Support Judgment for back child support in the amount of $271.00 per week for the period from February 15, 2001 through March 4, 2002.

The Child Support Judgment is undisputably actual child support, as determined by Justice Ark under the CSSA, and, therefore, it is a nondischargeable debt under Section 523(a)(5).[2]

## C. The Attorney's Fee Judgment

■ The Attorney's Fee Judgment is also set forth in the State Court Order. It is not specified to be a support obligation, but reads as follows:

**2.** It does not appear from all of the proceedings in the Brock Nondischargeability Proceeding that the Debtor actually disputes that the Child Support Judgment is nondischargeable support under Section 523(a)(5). It does appear, however, that she has appealed the

**"ORDERED, ADJUDGED AND DECREED,** that the Plaintiff shall be responsible for an[d] pay for any and all attorney counsel fees, costs and disbursements of the Defendant in the amount of $16,350.86, and the Defendant shall be entitled to judgment herein against the Plaintiff for said counsel fees, costs and disbursements, together with interest and execution thereon[.]"

The June 26, 2002 Findings of Fact[3] signed by Justice Ark in support of and at the time of the entry of the State Court Order (Plaintiff's Exhibit 11 at trial), contain the following two paragraphs in the Findings of Fact section:

23. It is the Court's determination that, under the circumstances, the Plaintiff has refused to reasonably and appropriately conduct herself and her arguments in this case, needlessly exacerbating the Defendant's attorney's fees and fees of the Law Guardian. The Defendant has been subjected to attorney's fees in excess of $16,000, as well as fees associated with the Law Guardian in excess of $2,000.

24. Despite the Court's Judgment of Divorce of December 22, 2000, the Plaintiff–Mother has willfully, knowingly and maliciously violated the Court's Order and thus the Defendant–Father is entitled to the Plaintiff–Mother being directed to pay the Defendant–Father's attorney's fees, costs and disbursements associated with the action herein.

In addition, the Conclusions of Law signed by Justice Ark in connection with the entry of the State Court Order determined that:

determination and the amount of the Judgment in the State Court.

**3.** These were presumably prepared by Brock's attorneys.

6. The Defendant met his burden to establish that the Plaintiff shall pay the Defendant's attorney's fees, costs and disbursements associated with this action.

These specific Findings of Fact and Conclusions of Law made by Justice Ark indicate that in making its award of attorney's fees, it was not the intention of the State Court to provide additional support. The award was intended to address: (1) the Debtor's willful, knowing and malicious violation of the party's Divorce Decree; and (2) her conduct in the Custody Action that unnecessarily increased the amount of attorney's fees incurred by Brock in prosecuting the Action.

Therefore, the Attorney's Fee Judgment was not in the nature of support and it is not a nondischargeable debt under Section 523(a)(5).

## II. *The Discharge Proceedings*

### A. Section 727(a)(4)(A)—False Oath or Account—and Case Law

Section 727(a)(4)(A) provides that:

(a) The court shall grant the debtor a discharge, unless—

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account[.]

11 U.S.C. § 727 (2003).

 From the cases that have been decided under Section 727(a)(4)(A), including this Court's Decision & Order in *In re Pierri,* Ch. 7 Case No. 97–20461, A.P. Case No. 97–2125 (W.D.N.Y. April 21, 1998), we know that for the Court to deny a debtor's discharge because of a false oath or account: (1) the false oath or account must have been knowingly and fraudulently made, *see Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244 (4th Cir.1994); (2) the required intent may be found by inference

from all of the facts, *see 6 L.King, Collier on Bankruptcy,* ¶ 727.04[1][a] at 37 (15th ed. rev.1996); (3) a reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of the fraudulent intent necessary to bar a discharge, *see In re Diorio v. Kreisler–Borg Const. Co.,* 407 F.2d 1330 (2d Cir.1969); (4) a false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent, *see Bank of Miami v. Espino (In re Espino),* 806 F.2d 1001 (11th Cir.1986); (5) the required false oath or account must be material; and (6) the required false oath or account may be a false statement or omission in the debtor's schedules or a false statement by the debtor at an examination at a creditors meeting, *see In re Ball,* 84 B.R. 410 (Bankr.D.Md.1988). Conversely, if items were omitted from the debtor's schedules because of an honest mistake or upon the honest advice of counsel, such a false declaration may not be sufficiently knowingly and fraudulently made so as to result in a denial of discharge.

### 1. *The Diamond Ring*

 From the evidence produced at trial and the pleadings and proceedings in the Debtor's bankruptcy case, I find that the Debtor: (1) owned and possessed the Diamond Ring when she filed her petition and executed her Schedules and Statements; and (2) knowingly and fraudulently failed to schedule the Diamond Ring as an asset.

It is undisputed that: (1) the Debtor failed to list the Diamond Ring as an asset on Schedule B, Item No. 7; and (2) she indicated in an October 23, 2002 e-mail to Brock (Plaintiff's Exhibit 13 at trial), when she offered it as part of a proposed settle-

ment, that she still owned and possessed the Ring.

The Debtor is an intelligent, educated and financially sophisticated individual, with an MBA, who valued the Diamond Ring in her 2000 divorce proceeding at $8,000.00. The Debtor's story that she sold the Ring to a Clem Naglee for $750.00 in September 2002, just prior to filing her petition in order to pay her rent, absolutely defies credibility, and this Court will afford it none.[4]

Furthermore, the Debtor has produced absolutely no evidence to confirm the alleged sale of the Diamond Ring to Clem Naglee, including producing him at trial to testify to the alleged sale or making any effort whatsoever to determine his whereabouts so that the Trustee or Brock's attorneys could depose or subpoena him. This further supports the only reasonable conclusion that this or any trier of fact could make, which is that there was no sale.

The Diamond Ring was a material asset of the Debtor and her bankruptcy estate at the time of the filing of her petition. As testified to by Brock, he paid $6,500.00 for it and gave it to her as an engagement ring, and, therefore, it was not exempt. The Debtor clearly knowingly and fraudulently failed to schedule the Ring so that it would not be available to her Trustee for liquidation and distribution to creditors.

As a result of this knowing and fraudulent false oath in failing to schedule the Ring, I find that the Debtor's discharge must be denied pursuant to Section 727(a)(4)(A).

■ In the alternative, the Debtor's discharge must be denied pursuant to Section 727(a)(4)(A), because I find that if there was a sale of the Diamond Ring to Clem Naglee, she knowingly and fraudulently made a false oath when she failed to disclose the sale in her answer to Question 10 on her Statement of Financial Affairs. If the Debtor had disclosed the sale on her Statement of Financial Affairs, the Trustee: (1) may have further investigated the transaction; and (2) if satisfied that there had been a sale, may have pursued Clem Naglee as the recipient of a fraudulent transfer, since Naglee clearly and knowingly paid less than fair consideration for the Ring.[5]

As an intelligent, educated and financially sophisticated individual, the Debtor could not honestly or inadvertently have failed to disclose the sale, if in fact one took place, in Question 10 of her Statement of Financial Affairs in view of the facts that she: (1) was confident enough to prepare the closing papers for the transfer of the Walnut Hill Property to her parents and their subsequent sale of the Property; (2) continued to have issues with Brock because of the Custody Action, and, therefore, would be very conscious of anything having to do with him, especially selling the engagement ring that he gave her; and (3) allegedly sold the Diamond Ring in September, the very same month she filed her petition and executed her Schedules and Statements.

---

4. The Debtor had: (1) $222,000.00 in a 401K; (2) parents who had received over $100,000.00 in cash from the sale of the Walnut Hill Property; and (3) other means to obtain rent money. She was not desperate enough to sell an $8,000.00 Diamond Ring for $750.00, an amount that under any circumstances was far below even its wholesale value.

5. Disclosing the Diamond Ring or its alleged sale at a Section 341 Meeting because of the appearance and questioning of Brock and/or his attorney is too late to cure the knowing and fraudulent false oath in the Debtor's Statement of Financial Affairs.

Furthermore, any protestation that she did not understand the question, totally lacks credibility, and this Court will afford it none.

In addition, her bankruptcy attorney could never honestly have advised her not to disclose the ownership or sale of the Diamond Ring on her Schedules or Statements.

With regard to the Diamond Ring, I find that the Debtor: (1) has proved herself not to be the honest debtor a discharge was intended for; and (2) that she knowingly and fraudulently made a false oath in failing to disclose this material asset on her Schedules or its alleged sale in her Statement of Financial Affairs. For these reasons, her discharge must be denied under Section 727(a)(4)(A).

## 2. The Citibank Mortgage

■ It is undisputed that the Debtor failed to disclose on Question 3A of her Statement of Financial Affairs that she made a payment, within ninety days of the filing of her petition, of $20,000.00, directly or indirectly, on the Citibank Mortgage, which she continued to be liable on even after her transfer of the Walnut Hill Property to her parents.

It is also undisputed that: (1) Citibank was a creditor of the Debtor at the time of the $20,000.00 payment on the Citibank Mortgage in or about August 2002; (2) non-exempt property of the Debtor was used to make the payment; (3) the Debtor had transferred legal title to the Walnut Hill Property at the time of the payment, so that, as to the Debtor, Citibank was nothing more than an unsecured creditor; and (4) there is nothing in the closing papers in connection with the transfer of the Walnut Hill Property to her parents

that obligates her to pay off the Citibank Mortgage.

On the other hand, if such a payment was made to fulfill an obligation that the Debtor incurred for the benefit of her parents in connection with the transfer of the Walnut Hill Property, the obligation to pay any part of the Citibank Mortgage was nothing more than an unsecured obligation.[6] In any event, it was necessary for the Debtor to disclose this payment in order for the Trustee to have all material information about the Debtor's financial affairs to properly administer her Chapter 7 estate.

As an intelligent, educated and financially sophisticated individual, the Debtor's failure to disclose, directly or indirectly, her payment on the Citibank Mortgage within ninety days of the filing of her petition could not have been an honest or inadvertent mistake, and her bankruptcy attorney could never honestly have advised the Debtor not to disclose the payment in response to Question 3A of her Statement of Financial Affairs.

With regard to the Citibank Mortgage, I find that the Debtor: (1) has proved herself not to be the honest debtor a discharge was intended for; and (2) that she knowingly and fraudulently made a false oath in failing to disclose this material payment on the Citibank Mortgage in her Statement of Financial Affairs. For these reasons, her discharge must be denied under Section 727(a)(4)(A).

## 3. The Walnut Hill Note

■ At the time of the filing of the Debtor's petition and the execution of her Schedules and Statements, the Walnut Hill Note had not been paid in full, and the Debtor has produced no documentation in-

---

**6.** This is true whether: (1) the Debtor's parents would have any offset or recoupment rights; or (2) the parents' claims may be subject to equitable subordination.

dicating that there were any legally agreed to offsets to the $200,000.00 principal balance still due on the Note.[7] Although the Debtor and her parents assert that at a minimum: (1) the amounts Gloria Weeden paid on the Citibank Mortgage; and (2) to some extent, the Debtor's ability to live rent free at Logans Run should be credited against the principal balance due on the Note, neither the Debtor nor her parents have produced any written agreements to that effect.

Furthermore, as to Logans Run: (1) the property is owned by the Logans Run Trust, not Gloria and Delmar Weeden, who are the obligors on the Walnut Hill Note; (2) the Debtor had no authority to enter into any offset agreements after the date of the filing of her petition, since the Walnut Hill Note was and remains an asset of her Chapter 7 estate; and (3) the Debtor did not even move into Logans Run until after the date of the filing of her petition.

In any event, there was clearly some amount due on the Walnut Hill Note on the date the Debtor filed her petition and executed her Schedules and Statements, and it is undisputed that she failed to disclose the existence of the Walnut Hill Note on Items No. 14, 17 or 33 of Schedule B of her Schedules, or anywhere else in her Schedules and Statements.

The Walnut Hill Note was a material asset of the estate which the Debtor could not have honestly or inadvertently failed to disclose, and her bankruptcy attorney could not honestly have advised her not to disclose it on her Schedules.

With regard to the Walnut Hill Note, I find that the Debtor: (1) has proved herself not to be the honest debtor a discharge was intended for; and (2) knowingly and fraudulently made a false oath when she failed to disclose this material asset on her Schedules. For those reasons, her discharge must be denied under Section 727(a)(4)(A).

### 4. Other Grounds Asserted under Section 727

Because I have determined that the Debtor's discharge must be denied under Section 727(a)(4)(A) because of her false oaths in knowingly and fraudulently failing to disclose: (1) her ownership or transfer of the Diamond Ring; (2) her direct or indirect payment on the Citibank Mortgage within ninety days of the filing of her petition; and (3) her ownership of the Walnut Hill Note, it is not necessary for me to address the other grounds that Brock and the Trustee have asserted should result in the denial of the Debtor's discharge. However, I reserve the right to make those determinations in the future if it is appropriate or necessary.

### III. *The Walnut Hill Proceeding*

#### A. Statutes and Case Law

The Trustee has alleged that the Debtor's transfer to her parents of legal title to the Walnut Hill Property on July 23, 2001 was an avoidable fraudulent conveyance, because it was made with the actual intent to hinder, delay and defraud her existing and future creditors, including Brock.[8]

---

**7.** As set forth above in this Decision & Order, there is nothing in the documentation produced by the Debtor in connection with the Walnut Hill Property transfer that even specifically obligates her to pay the Citibank Mortgage.

**8.** Based upon all of the facts and circumstances, pleadings and evidence presented in

connection with the Walnut Hill Proceeding, including at the trial, it would not be unreasonable to conclude that it was always the intention of the Debtor and her parents that only bare legal title to the Walnut Hill Property was to be transferred to her parents, and that all equitable interests in the Property and any proceeds of the Property would remain

Because the transfer of the Walnut Hill Property took place on July 23, 2001, more than one year before the filing of the Debtor's petition, the Trustee is not able to utilize Section 548 to avoid the transfer as an intentional fraudulent conveyance. Therefore, he must utilize the provisions of Section 544 and New York State Law.

Section 544(b) provides that:

The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544 (2003).

Section 276 of Article 10 of the New York Debtor and Creditor Law provides that:

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

New York Debtor and Creditor Law § 276 (2003).

 The burden of proof to establish actual fraud under Debtor and Creditor Law Section 276 is upon the creditor who seeks to have the conveyance set aside, and the standard for such proof is clear and convincing evidence. *Marine Midland v. Murkoff,* 120 A.D.2d 122, 126, 508 N.Y.S.2d 17 (1986), *appeal dismissed,* 69 N.Y.2d 875, 514 N.Y.S.2d 1029, 507 N.E.2d 322 (1987). Fraudulent intent, by its very nature, is rarely susceptible to direct proof and must be established by inference from the circumstances surrounding the allegedly fraudulent act. *Marine Midland,* 120 A.D.2d at 128, 508 N.Y.S.2d 17.

 I conclude that: (1) the transfer by the Debtor to her parents of the Walnut Hill Property was made with the actual intent to hinder, delay and defraud her creditors, then existing and future,[9] particularly Brock; (2) Delmar and Gloria Weeden were knowing participants in this intentionally fraudulent transfer; and (3) this transfer was only one part of a greater and ongoing fraudulent scheme to keep assets in which the Debtor had and has the equitable interest in beyond the reach of her creditors by keeping the legal title to those assets in the name of her parents or in revokable trusts established by them.[10]

The following specific facts and circumstances support this conclusion that the Walnut Hill transfer was made with the actual intent to hinder, delay and defraud the Debtor's creditors:

1. Final hearings in the Custody Action were held on July 23, 2001, the same day

---

with and be under the direct control of the Debtor. In that event, the Debtor's discharge would be denied for her failure to schedule her equitable ownership interest in the Walnut Hill Property.

9. This satisfies the creditor requirement of Section 544.

10. When one steps back and looks at the series of transactions between the Debtor and her parents beginning with the transfer of the Walnut Hill Property and ending with her living rent free at Logans Run while her parents: (1) cash in annuities to meet their living expenses and pay the mortgage on Logans Run, at the same time that they have the proceeds from the sale of the Walnut Hill Property in the Rental Account, it is obvious that this is all a part of a fraudulent scheme to keep the Debtor's equity in the Walnut Hill Property and its proceeds beyond the reach of her creditors. Any other explanation for such unreasonable behavior would completely lack credibility.

on which the Debtor recorded the deed to her parents of the Walnut Hill Property;

2. On the July 23, 2001, the date of the transfer of the Walnut Hill Property, the Debtor knew that she had knowingly and willfully violated the provisions of the December 22, 2002 Judgment of Divorce by reason of her unnoticed relocation to Florida with Connor, and that it was likely that Brock would receive some award against her in the Custody Action;

3. From the testimony of Delmar Weeden, it is not even clear that the Debtor's parents in fact had any monthly living expense deficiency in July of 2001. They had: (a) $21,600.00 in annual social security income; (b) no mortgage payment and no car payment; (c) only the ordinary monthly living expenses of an elderly retired couple; and (d) at most a $500.00 or $600.00 credit card balance, which they may or may not have paying off monthly. Further, it is clear from Delmar Weeden's testimony that the Debtor's parents could easily have cashed in some of the Annuities and/or reduced or eliminated any travel and recreational expenses to the extent that they were causing a monthly living expense deficiency.[11] Therefore, there is insufficient evidence to find that the parents in fact had a monthly living expense deficiency in July of 2001, the alleged reason why the Walnut Hill Property was transferred to them. Furthermore, for the Debtor to transfer the Walnut Hill Property, with equity of in excess of $130,000.00 and a monthly rental stream of $1,900.00, to her parents so that they could meet an alleged but unproven monthly living expense deficiency, which, if it existed, would not have been more than $500.00, allegedly because they were in a lower tax bracket, is absolutely preposterous, especially when the Debtor has not proven that there was in fact any tax benefit achieved by the transfer;

4. After her transfer of the Walnut Hill Property to her parents, the Debtor continued to pay the monthly mortgage payments on the Citibank Mortgage, presumably with after-tax dollars, since she could not deduct any portion of the payments, even the interest portion, because she no longer had a legal ownership interest in the Walnut Hill Property. Furthermore, the $667.00 monthly interest that the Debtor was receiving from her parents on the Walnut Hill Note was ordinary income to her. In addition, the Debtor's parents could not deduct the Citibank Mortgage payments, which they did not pay. Since: (a) the Debtor was paying the Citibank Mortgage with after-tax dollars; (b) she was receiving $667.00 monthly in ordinary income; and (c) the Debtor's parents could not deduct the payments on the Citibank Mortgage, it does not appear that the overall taxable benefit that the Debtor allegedly transferred the Property to achieve was in fact achieved;

5. Since May 2003, when Delmar and Gloria Weeden sold the Walnut Hill Property, they have maintained all or substantially all of the net proceeds, most likely in excess of $180,000.00, in the Rental Account, allegedly for the payment of any capital gains taxes. However, the capital gains taxes would be minimal, if any, since they obtained legal title to the Property for a stated consideration of $200,000.00 and sold it for $210,000.00. Therefore, it is

---

11. At the time of trial, Delmar Weeden indicated that: (1) he and Gloria Weeden had reduced their recreational and travel expenses because they no longer had any income from the Walnut Hill Property and they were paying the mortgage on Logans Run, where the Debtor was living rent free; (2) they were not utilizing the proceeds that they had received from the sale of the Walnut Hill Property; and (3) they were cashing in some of the Annuities to make ends meet.

obvious that the proceeds were and continue to be retained in the Rental Account for the benefit of the Debtor and in furtherance of the ongoing fraudulent scheme; and

6. Without the rental stream from the Walnut Hill Property or any rental from Logans Run, the Debtor's parents testified that they are paying any monthly living expense deficiency that they may have, as well as the mortgage on Logans Run, by cashing in some of the Annuities, rather than using any monies in the Rental Account or demanding rent from the Debtor. This further indicates that all of the transactions involving the Walnut Hill Property and Logans Run are part of a fraudulent scheme to keep the equity that the Debtor had in the Walnut Hill Property available to her, but out of the reach of her creditors, including Brock.

As set forth above, I find that the transfer by the Debtor of the Walnut Hill Property to her parents was an intentional fraudulent conveyance, made with intent to hinder, delay and defraud her creditors, then existing and future, including Brock. I further find that Delmar and Gloria Weeden have no defense of good faith under Section 550 in connection with the transfer to them of the Walnut Hill Property, or any and all other transactions in connection with the Property. Therefore, since the Property was transferred to what appears to be a bona fide purchaser for value before the Debtor filed her petition, the Trustee is entitled to file a judgment against Delmar and Gloria Weeden for the value of the Walnut Hill Property at the time of its transfer on July 23, 2001, less the then-balance due on the Citibank Mortgage.

## IV. *Reasonable Attorney's Fees*

Section 276–a of the New York Debtor and Creditor Law provides that:

In an action or special proceeding brought by a creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action or special proceeding the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors shall recover judgment, the justice or surrogate presiding at the trial shall fix the reasonable attorney's fees of the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors in such action or special proceeding, and the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors shall have judgment therefor against the debtor and the transferee who are defendants in addition to the other relief granted by the judgment. The fee so fixed shall be without prejudice to any agreement, express or implied, between the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors and his attorney with respect to the compensation of such attorney.

New York Debtor and Creditor Law § 276–a (2003).

I find that the Trustee has met his burden to show that: (1) the Debtor transferred her interest in the Walnut Hill Property to Delmar and Gloria Weeden with the actual intent to hinder, delay and defraud both present and future creditors; and (2) Delmar and Gloria Weeden received the transfer with knowledge of that fraudulent intent and of an ongoing fraudulent scheme; and (3) Delmar and Gloria Weeden acted intentionally and in furtherance of such fraud. Therefore, the Trustee is also entitled to an award of reasonable attorney's fees.

By March 8, 2004, the Trustee shall file a proposed judgment against Delmar and Gloria Weeden, which shall be accompanied by time sheets and disbursement records in connection with the Walnut Hill Proceeding, so that the Court can determine the Trustee's reasonable attorney's fees and expenses and include them as part of the judgment. Furthermore, the Trustee may include in the judgment any reasonable enforcement provisions that he believes are necessary or appropriate, and available to this Court, that would enable him to collect the judgment against Delmar and Gloria Weeden, who are Florida residents.

### CONCLUSION

As more fully discussed in this Decision & Order: (1) the Child Support Judgment is determined to be a nondischargeable debt; (2) the Attorney's Fee Judgment is determined not to be a nondischargeable debt; (3) the Debtor's discharge is in all respects denied; (4) the Debtors transfer of the Walnut Hill Property is determined to be an avoidable fraudulent transfer, made with the actual intent to hinder, delay and defraud her present and future creditors; (5) the Debtor's parents, Delmar and Gloria Weeden, have no good faith defense in connection with the Debtor's transfer to them of the Walnut Hill Property, and they are determined to be knowing participants in the fraud and in an ongoing fraudulent scheme; and (6) the Trustee shall have judgment against Delmar and Gloria Weeden, in accordance with this Decision & Order, which shall include attorney's fees and expenses as authorized under Section 276–a of the New York Debtor and Creditor Law.

**IT IS SO ORDERED.**